UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

CORDIS CORPORATION,

**09-23650**

Plaintiff,

**CIV-JORDAN**

v.

*7* McALILEY

JAMES HAGEMEISTER and ABBOTT
LABORATORIES.

Defendants.
_____/

FILED by _____ D.C.

DEC - 7 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Cordis Corporation ("Cordis") sues James Hagemeister ("Hagemeister") and
Abbott Laboratories ("Abbott") and states as follows:

**I.   INTRODUCTION**

1.      This is an action to enforce a written employment agreement and to
prevent the unauthorized use and dissemination of Cordis' highly sensitive confidential
and or trade secret information.  Cordis seeks injunctive relief and damages against
Hagemeister and Abbott pursuant to Florida Statute §§ 542.335 and 688.001, et seq.

2.      In or about February 2003, Hagemeister began employment with Cordis
as a sales representative responsible for promoting Cordis' medical devices to
physicians and hospitals. Hagemeister was a highly compensated Cordis employee
who earned well in excess of $225,000 per year and in some years, in excess of
$300,000.

3.      Prior to beginning employment with Cordis, Hagemeister executed the
attached Secrecy, Non-Competition and Non-Solicitation Agreement (the "Agreement,"

#92975 v4

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

attached at Exhibit 1) pursuant to which, among other things, Hagemeister agreed not to work for a Cordis competitor.

4.      Hagemeister recently resigned from his employment with Cordis and accepted employment with one of Cordis' direct competitors, Abbott, as a sales representative selling the same types of medical devices he sold for Cordis. Hagemeister's employment with Abbott breaches the terms of the Agreement.

5.      Hagemeister planned his departure to Abbott for weeks, if not months, as is evidenced by the "Game Plan" memorandum prepared for Abbott describing how he would, as an Abbott employee, use his long "established" relationships with Cordis' customers to ensure that "much of the competition is minimized or eliminated." Nevertheless, Hagemeister intentionally decided not to announce his resignation until one day after attending a meeting at which Cordis shared with him the company's 2010 marketing strategies, product pricing information and other highly sensitive, confidential information because he knew such information would be distributed and discussed at the meeting and he knew he could use it for the benefit of his new employer, Abbott.

6.      Hagemeister's beach of the Agreement, with the aid and assistance of Abbott and his threatened or actual misappropriation of Cordis' trade secrets and other confidential information and the disclosure thereof to or for the benefit of Abbott are causing and will continue to cause Cordis to suffer irreparable and immediate harm. Cordis seeks appropriate injunctive relief to prevent these activities.

## II.    JURISDICTION AND VENUE

7.      The Court has diversity jurisdiction because the action involves citizens of different states and the amount in controversy for each claim exceeds the sum and value of $75,000, exclusive of interest and costs.  28 U.S.C. § 1332.  All of the claims

#92975 v4

2
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

are so related to each other that they form the same case or controversy.  28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to the terms of the Agreement. Additionally, the Court has personal jurisdiction over Hagemeister pursuant to the express terms of the Agreement in which he "consent[ed] to personal jurisdiction of and venue in" the courts located in Miami-Dade County, Florida (see Agreement at ¶ 17); pursuant to Florida Statute § 48.193(2) as a result of his substantial, not isolated, continuous and systematic general business conduct more fully described herein and pursuant to Florida Statute § 48.193(1)(b), because he has misappropriated confidential and trade secret information which he obtained from Cordis in Florida and has caused injury to Cordis in Florida.  The Court has jurisdiction over Abbott pursuant to Florida Statute § 48.193(1)(a) because Abbott engages in business in this District and this State by selling its products for profit to hospitals in Florida.

### III.   PARTIES

7.      Plaintiff Cordis is a corporation in good standing organized under the laws of the State of Florida and currently maintains its corporate headquarters and principal place of business in New Jersey.

8.      Defendant Hagemeister is an individual citizen and resident of the State of Missouri who may be served at his residence address, 12304 Carberry Place, St. Louis, Missouri 63131.

9.      Defendant Abbott is an Illinois corporation with its principal place of business and corporate headquarters located in Abbott Park, Illinois.

#92975 v4

3
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower • 150 West Flagler Street • Miami, FL 33130 • 305-789-3200

## IV.    FACTUAL BACKGROUND

### Cordis' Business

10.    Cordis is a wholly owned subsidiary of Johnson & Johnson.  Cordis designs, manufactures, markets, and sells a broad portfolio of advanced medical devices that are used in minimally invasive surgery to treat, among other things, clogged arteries commonly found in patients suffering from coronary artery disease. Cordis' primary product is called the CYPHER® Sirolimus-eluting Coronary Stent (the "CYPHER® Stent").  A stent is a small metal mesh tube which a physician inserts into a patient's coronary artery to clear away plaque and to keep the artery propped open so that blood can flow freely through the artery.  In addition to the CYPHER® Stent, Cordis sells other products which physicians use in minimally invasive surgical procedures to treat and clear clogged coronary arteries.  Such products include catheters, guidewires, angioplasty balloon catheters, and introducer sheaths (collectively "Cardiology Products").

### Cordis and Abbott are Direct Competitors

11.    Abbott competes with Cordis through the sale of Abbott's Cardiology Products, including its own version of a stent known as the Xience V Everolimous-eluting Coronary Stent system (the "Xience Stent").  Abbott's Cardiology Products compete with many of Cordis' Cardiology Products.  The companies' Cardiology Products are designed to treat the same disease state, in the same manner.  The companies compete with each other throughout the United States.  Abbott sales representatives, known as Territory Managers, cover all geographic territories currently covered by Cordis sales representatives.  Hagemeister is selling or will sell Abbott's Cardiology Products as part of his responsibilities for Abbott.

#92975 v4

**Cordis Hires Hagemeister and Enters into Agreement with Him**

12.    Cordis hired Hagemeister effective February 2003 as a sales representative responsible for promoting Cordis' Cardiology Product to Cordis' customers and prospective customers.

13.    As a condition of and before starting his Cordis employment, Hagemeister executed the Agreement.

14.    Hagemeister acknowledged that, by accepting employment with Cordis he would receive Confidential Information including information related to the company's research, development, marketing, selling, sales volumes and strategies.   He further acknowledged and agreed that he would not work for a Cordis competitor as set forth in the Agreement:

> **I recognize that the business in which [Cordis] is engaged is extremely competitive and that the Company will be providing me with Confidential Information both at the commencement of my employment and thereafter . . . . I recognize that the Confidential Information is significant to the Company's competitive position and that the Company has a legitimate business interest in maintaining as confidential the Confidential Information.  Therefore, I acknowledge that the Company expects me to keep such Confidential Information secret and also expects me not to compete with the Company during my employment and for a period of time thereafter.**
>
> **I recognize that as part of my employment, the Company may provide me with Extraordinary or Specialized Training and that the Company has a legitimate business interest in ensuring that the Company, and not a Conflicting Organization, obtains the benefit of having provided me with such training.**
>
> *See* **Exhibit 1 at 1.**

15.   Hagemeister's non-compete agreement prevents him from, among other things, working for any Cordis competitor (Exhibit 1, at ¶6).   Specifically, the Agreement provides that

> **"for a period of 18 months after termination of my employment with the COMPANY for any reason, I will not render services directly or indirectly to any**

> **CONFLICTING ORGANIZATION . . . in which the services I provide could enhance the use or marketability of a CONFLICTING PRODUCT[1] by application of [Cordis'] Confidential Information."**

16.   Additionally, the Agreement prohibits Hagemeister's solicitation of Cordis customers by providing that for:

> **"18 months after termination of my employment with the COMPANY for any reason, I will not solicit any business from, sell to or render any service to, or directly or indirectly help others to solicit business from or render service or sell to, any of the accounts, customers, or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY..."**
>
> *See* **Exhibit 1 at ¶ 7.**

17.   Hagemeister also acknowledged that "Confidential Information is of great value to the Company, that the Company has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including a Conflicting Organization, will cause immediate and irreparable harm to the Company."  *See* Exhibit 1 at ¶ 5.

18.   In the event of a breach of the Agreement, and because Cordis cannot be adequately compensated as a matter of law, Hagemeister agreed that Cordis could obtain injunctive and other equitable relief, as well as damages:

> **"I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using [Cordis' Confidential Information] prohibited by paragraph 5 above, accepting employment  or providing services prohibited by paragraph 6 or 7 above . . . the COMPANY shall have the right and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in the paragraphs 6 and 7 above. . .**

---

[1] The term "CONFLICTING PRODUCT" is defined in the Agreement to mean "any product . . . of any person or organization other than [Cordis] in existence or under development which resembles or competes with a product . . . upon which I shall have worked or about which I become knowledgeable as a result of employment with [Cordis] and whose marketability could be enhanced by application to it of [Cordis'] Confidential Information which I shall have had access to during my employment." The term "CONFLICTING ORGANIZATION" is defined in the Agreement to mean "any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing or selling of a CONFLICTING PRODUCT."

#92975 v4

6
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, p.a.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

*See* **Exhibit 1 at ¶ 14.**

## Cordis provides Hagemeister Extraordinary Training and Confidential and Trade Secret Information

19.     In keeping with its commitments and in connection with Hagemeister's Cordis employment,    Cordis provided Hagemeister with: (i) trade secrets; (ii) CONFIDENTIAL INFORMATION as defined in the Agreement; and (iii) extensive, extraordinary and specialized training, including, at the commencement of his employment with Cordis in 2003, a seven week, multi-component sales training continuum called CYPHER College.  The CYPHER College training included classroom and laboratory work, field training, in-house training and sales simulations for two weeks at Cordis' Miami Lakes, Florida training and education center, and home study - all designed to educate new sales representatives on the unique characteristics of Cordis' products and to teach sales representatives to effectively sell such products using Cordis' methodologies.    In particular, Hagemeister was one of the first sales representatives in the country to be trained on an entirely new class of product, the drug eluting stent (DES) which Cordis brought to market, before any other company, in April 2003 and with which Hagemeister had no prior experience.

20.     In addition to his initial training in 2003, Cordis provided Hagemeister with continuing training during his tenure with the company.  Such training included training provided at the Company's annual National Sales Training meetings which Hagemeister attended, including a four day meeting in Orlando, Florida in 2008 and training provided prior to new product launches on a periodic basis throughout his Cordis employment.

#92975 v4

7
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

21.    From the beginning of his employment with Cordis in 2003, Cordis also provided Hagemeister direction on how to perform his job and constant, almost daily, flow of trade secret and Confidential Information disseminated via electronic mail and other means from its company headquarters and principal place of business which, until 2008, was located in Miami Lakes, Florida.    Such information, directions and instructions included marketing plans and strategies, pricing information, sales strategies, competitive intelligence, customer purchasing habits, requirements and trends, product launch timelines, instructions and guidance on how to conduct selling activities to Cordis' customers, Cordis research and development initiatives and product pipeline information as well as Cordis market share data and other trade secret and Confidential Information which Hagemeister used to perform his job as a Cordis sales representative.    Additionally, until his departure from Cordis in November 2009, Hagemeister communicated regularly with Cordis' Miami Lakes office regarding sensitive and confidential information about customer complaints, product malfunctions, product expiry and other matters essential to Cordis' business.

22.    Cordis goes to great lengths to protect all of the trade secret and confidential information described above by having employees sign confidentiality agreements, by limiting electronic access to the information via passwords and by virtue of other security measures.  Cordis sales representatives' use of such information gives the company a competitive advantage in the market.

23.    The Cordis Confidential and trade secret information Hagemeister has is current, updated, not known to the public, not capable of being properly ascertained by the public and valuable to the Company.

#92975 v4

8
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

24.     On a monthly basis, through and until his resignation in November 2009, Hagemeister received from Cordis reports, such as the "Premier Performance" report, demonstrating customer performance pursuant to nation-wide purchase and sales contracts, and on a weekly basis, Hagemeister's supervisor conducted conference calls with the area sales team to discuss CYPHER® Stent sales, balloon catheter sales, pricing strategies, marketing strategies, and to provide a forum in which sales representatives could share best practices with their colleagues.   Additionally, on a continuous basis, Cordis sales representatives, including Hagemeister, have access to Cordis' intranet site, www.myCordis.com.  Access to the site is restricted to the Cordis sales team and the site provides sales representatives with information on Cordis' sales performance together with updated information on marketing strategies, sales training, competitive intelligence, sales rankings, sales representative rosters, sales reports, educational materials, promotional materials, and analysis of clinical data supporting Cordis' products.  All of this information, which gives Cordis a competitive advantage in the market, is confidential and not generally available to the public.  This information would enable a company such as Abbott to compete against Cordis unfairly if it gained access to such information.

25.     On November 10, 2009, just one day before Hagemeister announced he was leaving Cordis to begin work for Abbott, Hagemeister participated in a division meeting during which Cordis shared with Hagemeister, among other things, the company's 2010 marketing strategy.  This strategy applies to all Cordis' marketing and sales efforts across the country.  Additionally, Cordis shared with Hagemeister the

#92975 v4

9
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

company's pricing strategies and provided training on marketing of a new version of the CYPHER® Stent which Cordis markets in competition against Abbott's products.

26.     Upon information and belief, Hagemeister attended the November 10, 2009 meeting with full knowledge that Cordis' confidential trade secret information (which he knew the company keeps secret) would be discussed and disseminated at the meeting and that he would soon begin employment with Abbott.

27.     Hagemeister can and will use, consciously or unconsciously, his intimate knowledge of Cordis' customer relationships and confidential, proprietary and trade secret information to unfairly compete with Cordis and to improve the marketability of Abbott's products.   If he is allowed to work at Abbott in connection with Abbott's Cardiology Products that compete with Cordis' Cardiology Products and/or if he is allowed, as he intends, to work on Abbott's behalf to solicit Cordis customers he contacted on Cordis' behalf, he will, as he has avowed in his Game Plan, improperly exploit his relationships with Cordis' customers that he developed on Cordis' behalf and at Cordis' expense and he will use for the benefit of Abbott and/or disclose Cordis' confidential, proprietary and trade secret information to Abbott.   Indeed, Hagemeister's "Game Plan" evidences his ill intentions toward Cordis' interests.

**Hagemeister Breaches the Agreement with the Aid of Abbott**

28.     On November 11, 2009, Hagemeister resigned from his Cordis employment effective November 27, 2009 and announced that he had accepted a Sales Representative position with Abbott.   Following the tender of his resignation Cordis representatives reminded Hagemeister of his obligations under the Agreement and provided him with another copy of it.   Cordis representatives also communicated with

#92975 v4

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

Abbott to inform Abbott of Cordis' objection to Hagemeister's planned employment with
Abbott.

29.     Upon information and belief, during the week of November 23, 2009,
Hagemeister began meeting with Abbott officials and customers to discuss his
forthcoming efforts as an Abbott employee.   Hagemeister's last day as a Cordis
employee was November 27, 2009.

30.     Hagemeister has breached (and/or will imminently breach) the Agreement
by, among other things: (i) rendering services, including the sale of competing products,
for a Cordis competitor; (ii) soliciting business from, selling to, and rendering service to,
and, directly or indirectly, helping others to solicit business from, sell to, and render
service to accounts, customers, and clients with whom he had contact during the last 12
months of his Cordis employment with respect to products and services that do or could
compete with products and services sold or developed by Cordis; and (iii) disclosing to
or using for the benefit of Abbott, Cordis' trade secrets and other confidential
information.

31.     Cordis has legitimate business interests justifying the enforcement of the
restrictive covenants set forth in the Agreement.  Specifically, Cordis has a legitimate
business interest in the extraordinary and specialized training it provided Hagemeister;
the private, Confidential Information, including trade secrets, which it has given
Hagemeister; Cordis' substantial relationships with specific prospective and existing
customers, patients and clients; and the customer, patient and client goodwill Cordis
has established in the region which Hagemeister serves.

#92975 v4

11
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower • 150 West Flagler Street • Miami, FL 33130 • 305-789-3200

32.    All conditions precedent to Cordis' right to enforce the Agreement have occurred, have been performed, or will be performed by Cordis, including its obligation under paragraph 9 of the Agreement to pay Hagemeister his Cordis gross monthly pay, or a portion of it, if he demonstrates that the prohibitions in paragraph 6 and 7 prevent him from obtaining employment consistent with his training and education during the effective period of the prohibitions.

<u>COUNT I – Breach of Contract-- Hagemeister</u>

33.    Cordis realleges paragraphs 1 through 32 as though fully set forth herein.

34.    Hagemeister has breached the Agreement.

35.    Cordis has been damaged as a result of Hagemeister's breach of the Agreement.

36.    Enforcement of the restrictive covenants set forth in the Agreement is reasonably necessary to protect Cordis' legitimate business interests described above.

37.    If Hagemeister is not temporarily restrained and then preliminarily and permanently enjoined from violating the terms of paragraphs 5, 6 and 7 of the Agreement, Cordis will continue to suffer immediate and irreparable harm.  Cordis does not have an adequate remedy at law.

38.    Hagemeister agreed, in paragraph 14 of the Agreement, that, if he violated the terms of paragraph 5 of the Agreement or accepted employment or provided services prohibited by paragraphs 6 or 7 of the Agreement, Cordis would be entitled to, in addition to any other remedies it may have, injunctive relief to bar him from violating paragraph 5 of the Agreement and accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7.

#92975 v4

12
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, p.a.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

39.    Pursuant to Florida Statute § 542.335 Cordis is entitled to injunctive relief to protect its legitimate business interests by enforcement of paragraphs 5, 6, 7, and 14 of the Agreement.

40.    Cordis has complied with and fulfilled all conditions precedent to bringing this action.

WHEREFORE, Cordis respectfully requests that the Court:

(a)    Issue a temporary restraining order restraining Hagemeister from working for Abbott in a capacity which requires him to have responsibility for selling or promoting (or, assisting in the sale or promotion of) Cardiology Products and from otherwise breaching paragraphs 5, 6 and 7 of the Agreement;

(b)    Issue a preliminary injunction enjoining Hagemeister from working for Abbott and from otherwise breaching paragraphs 5, 6 and 7 of the Agreement;

(c)    Issue a permanent injunction, consistent with the terms and time limitations contained in paragraphs 5, 6 and 7 of the Agreement, enjoining Hagemeister from working for Abbott and from otherwise breaching paragraphs 5, 6 and 7 of the Agreement;

(d)    Enter judgment in favor of Cordis and against Hagemeister in such amount as is established at trial together with interest thereon;

(e)    Pursuant to Florida Statute § 542.335, award Cordis its reasonable attorneys' fees necessarily incurred in the prosecution of this action; and

(f)    Award Cordis all other relief, legal and equitable, to which it is entitled, or which the Court deems just and proper.

**COUNT II –Tortious Interference -- Abbott**

#92975 v4

13

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

41.     Cordis realleges paragraphs 1 through 32 as though fully set forth herein.

42.     Cordis and Hagemeister maintained a mutually advantageous business relationship pursuant to the Agreement and under which Cordis has legal rights.

43.     Abbott is aware of the fact that Cordis sales representatives, including Hagemeister, are bound by non-competition agreements which prohibit Cordis sales representatives from, among other things, selling competing products for Cordis' competitors and which prohibit them from soliciting business from the doctors, hospitals and other customers on whom they called while employed by Cordis.

44.     Abbott is aware that the Agreement prohibits Hagemeister from using Confidential Information acquired during his employment with Cordis to benefit any Cordis competitors, including Abbott.

45.     At all relevant times, Abbott had knowledge of Cordis' valid contractual and business relationship with Hagemeister and Abbott hired Hagemeister knowing that he is subject to the terms of the Agreement.

46.     Abbott has knowingly and intentionally interfered with Cordis' relationship with Hagemeister.  Abbott's actions are unjustified.

47.     As a result of Abbott's actions, Cordis has suffered and will continue to suffer damages.

WHEREFORE, Cordis respectfully requests that the Court enjoin Abbott from tortiously interfering with Cordis' business relationship with Hagemeister and enter judgment against Abbott in such amount as is established at trial together with interest thereon and award Cordis such other legal and equitable relief as the court deems just and proper.

#92975 v4

14
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower • 150 West Flagler Street • Miami, FL 33130 • 305-789-3200

## COUNT III – Misappropriation of Confidential Information and Trade Secrets Under the Florida Uniform Trade Secrets Act and Common Law

48.     Cordis realleges paragraphs 1 through 32 as though fully set forth herein.

49.     Various Cordis Confidential Information in Hagemeister's possession constitutes trade secrets.

50.     In addition, Hagemeister owes Cordis a common law and contractual duty of loyalty to preserve and not to use or disclose without authorization, Cordis' trade secret and Confidential Information that he learned during the course of his employment with Cordis.

51.     Hagemeister misappropriated Cordis' trade secret and Confidential Information by intentionally and improperly acquiring such information with the knowledge that he would soon go to work for Abbott.  Abbott has improperly acquired Cordis' Confidential and trade secret information by hiring Hagemeister with the knowledge that he will use it for Abbott's benefit.

52.     Hagemeister and Abbott have misappropriated and/or will misappropriate Cordis' trade secrets described herein during the course of Hagemeister's employment with Abbott.

53.     Hagemeister and Abbott have used, or will use Cordis' trade secrets to their benefit.

54.     Cordis has suffered and or will suffer irreparable damage as a result of this misappropriation.

55.     Cordis has no adequate remedy at law.

WHEREFORE, Plaintiff, Cordis Corporation respectfully requests that the Court:

#92975 v4

15
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

(a)     Issue a temporary restraining order restraining Hagemeister from breaching paragraph 5 of the Agreement and otherwise barring Defendants Hagemeister and Abbott from using and or disclosing Cordis' trade secrets and other Confidential Information in any manner;

(b)     Issue a preliminary injunction enjoining Hagemeister from breaching paragraph 5 of the Agreement and otherwise barring Defendants Hagemeister and Abbott from using and or disclosing Cordis' trade secrets and other Confidential Information in any manner;

(c)     Issue a permanent injunction, enjoining Hagemeister from breaching paragraph 5 of the Agreement and otherwise barring Defendants Hagemeister and Abbott from using and or disclosing Cordis' trade secrets and other Confidential Information in any manner;

(d)     Enter judgment in favor of Cordis and against Hagemeister and Abbott in such amount as is established at trial together with interest thereon;

(e)     Award Cordis exemplary damages pursuant to Florida Statute § 688.004, in such amount as is established at trial;

(f)     Pursuant to Florida Statute § 688.005, award Cordis its reasonable attorneys' fees necessarily incurred in the prosecution of this action; and

(g)     Award Cordis all other relief, legal and equitable, to which it is entitled, or which the Court deems just and proper.

#92975 v4

16
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower • 150 West Flagler Street • Miami, FL 33130 • 305-789-3200

Dated:  December 7, 2009

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.

By:  *Bayardo E. Aleman*

ERIC S. ROTH
Florida Bar No. 864935
eroth@stearnsweaver.com
BAYARDO E. ALEMAN
Florida Bar. No. 028791
baleman@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile:  (305) 789-3395

*ATTORNEYS FOR PLAINTIFF,*
*CORDIS CORPORATION*

#92975 v4

17

# EXHIBIT 1



a Johnson-Johnson company

## EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee: _James Hygomeister_

Residence Address: _12304 Cueberry Ave_
_St.Lous, MO 63131_

As used in this Agreement:

**the COMPANY** means CORDIS CORPORATION and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** mean discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about trade secrets, products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's existing and prospective customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

**CONFLICTING PRODUCT** means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

**EXTRAORDINARY OR SPECIALIZED TRAINING** means any training or education which the COMPANY directly or indirectly provides to enable me to perform the responsibilities and duties of my employment with the COMPANY.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY has a legitimate business interest in maintaining as confidential the CONFIDENTIAL INFORMATION. Therefore, I acknowledge that the COMPANY expects me to keep such CONFIDENTIAL INFORMATION secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

I recognize that as part of my employment, the COMPANY may provide me with EXTRAORDINARY OR SPECIALIZED TRAINING and that the COMPANY has a legitimate business interest in ensuring that the COMPANY, and not a CONFLICTING ORGANIZATION, obtains the benefit of having provided me with such training.

Accordingly, in consideration of my receipt of CONFIDENTIAL INFORMATION, and/or EXTRAORDINARY OR SPECIALIZED TRAINING, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 10:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work

Revised 1-22-02

performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2.   I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire, I agree to assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

3.   I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.   I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.   I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.   During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7.   I recognize that the COMPANY's relations with its existing and prospective accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the existing and prospective accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the existing or prospective accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.   To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9.   I acknowledge that I have carefully read and considered the provisions of paragraphs 6, 7, and 8 hereof and, after having done so, agree that the restrictions set forth (including but not limited to, the time period restrictions, scope of activity encompassed by the restrictions and the geographical area restrictions) are fair and reasonable and are reasonably necessary to protect the legitimate business interests of the COMPANY.

10. If the COMPANY terminates my employment with the COMPANY without cause, and if I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only as long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Monthly Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: my annual base pay, annual commissions, year-end cash bonus, and the monetary value of my year-end stock award (but not stock option grants, any other extra compensation or benefits). My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY. My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

11. In order to qualify for the payments provided for in paragraph 10 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation (including but not limited to a list of the names and phone numbers of all persons or entities I contacted during the prior month to inquire about possible employment). I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 11.

12. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will no longer be obligated to make the payments that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 13 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This Agreement shall be interpreted according to the laws of the State of Florida without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement shall be brought in the courts of Miami-Dade County, Florida or, if subject matter jurisdiction exists, in the United States District Court for the Southern District of Florida. I consent to personal jurisdiction of and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited. This Agreement may only be modified, amended or changed by written instrument executed by both the COMPANY and me.

19. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

20. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the

Revised 1-22-02

COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

21. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY.   I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period.  During any notice period, I will provide such transitional services as the COMPANY may request.  The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

I ACKNOWLEDGE HAVING READ, UNDERSTOOD, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: ___2/5/03___

_____
EMPLOYEE SIGNATURE
_____
Name
_____
Address
_____
City/State

page 4 of 4                                                            Revised 1-22-02

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)    NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS**

Cordis Corporation

**09-23650**

**DEFENDANTS**

James Hagemeister and Abbott Laboratories Inc.

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade County, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

**CIV-JORDAN**

County of Residence of First Listed Defendant   St. Louis, MO
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

FILED by ____ D.C.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Eric S. Roth, Esq., Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., 150 W. Flagler St., Suite 2200, Museum Tower, Miami, FL 33130  305-789-3200

09-23650-CV-Jordan/McAliley

Attorneys (If Known)

McALILEY

DEC - 7 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**(d)** Check County Where Action Arose:  ☒ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☒ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service |
| | | | **PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus-Alien Detainee<br>☐ 465 Other Immigration Actions | | | ☐ 950 Constitutionality of State Statutes |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S)** (See instructions second page):

a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ☐ YES ☐ NO

JUDGE _____    DOCKET NUMBER _____

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Claim for Breach of Contract and Injunctive Relief pursuant to § 542.335, Fla. Stat. and for damages for tortious interference. Personal jurisdiction based on contract forum selection clause as well as § 48.193. Fla. Stat.

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ >$75K exclusive of int.+costs
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  12-7-09

FOR OFFICE USE ONLY

AMOUNT $350.    RECEIPT # 101315    IFP

12/07/09